**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

WESLEY WILLIAMS,

                                    Plaintiff,

            v.

KEPRO, et al.,                                    No. 9:21-CV-302
                                                  (TJM/CFH)

                                    Defendants.

_____

**APPEARANCES:**                    **OF COUNSEL:**

Wesley Williams
06-A-3252
Clinton Correctional Facility
P.O. Box 2001
Dannemora, New York 12929
Plaintiff pro se

Attorney General for the           DAVID C. WHITE, ESQ.
State of New York                  NICHOLAS W. DORANDO, ESQ.
The Capitol                        Assistant Attorneys General
Albany, New York 12224
Attorneys for defendants
Timothy E. Whalen and Susan Devlin-Varin

Brown Gruttadaro & Prato, PLLC     JOHN MATTHEW CONIGLIO, ESQ.
19 Prince Street
Rochester, New York 14607
Attorney for defendant Kepro

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER[1]**

---

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff <u>pro se</u> Wesley Williams ("plaintiff"), who was at all relevant times in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 against defendants Kepro,[2] Timothy E. Whalen, and Susan Devlin-Varin, for violations of his Eighth Amendment rights.  <u>See</u> Dkt. No. 51 ("Am. Compl.").  Presently before the Court is Kepro's motion for summary judgment.  <u>See</u> Dkt. No. 108.  For the following reasons, it is recommended that Kepro's motion be granted.

## I.  Plaintiff's Failure to Respond

Local Rule 56.1 mandates that the party moving for summary judgment file a Statement of Material Facts setting forth the "material fact[s] about which the moving party contends there exists no genuine issue."  N.D.N.Y. L.R. 56.1(a).  The party opposing a motion for summary judgment must "file a separate Response to the Statement of Material Facts.  The opposing party response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs."  <u>Id.</u> at 56.1(b).  "Each denial shall set forth a specific citation to the record where the factual issue arises."  <u>Id.</u>; <u>see</u> <u>Lee v. City of Troy</u>, 520 F. Supp. 3d 191, 198 (N.D.N.Y. 2021) ("Because a naked denial of a fact the movant claims to be undisputed would do little to

---

[2] In his Amended Complaint, plaintiff named "APS, The outside vendor retained by DOCCS" as a defendant  Dkt. No. 51 at 1.  In its Answer, APS noted that its name was changed to KEPRO.  <u>See</u> Dkt. No. 58 at 1, ¶ 1.  In support of its motion for summary judgment, KEPRO's Program Director, Megan Jackson, declared that the company is named Keystone Peer Review Organization, Inc., or Kepro.  <u>See</u> Dkt. No. 108-2 at 1, ¶ 1.  As such, throughout this Report-Recommendation and Order, the undersigned will refer to defendant as Kepro.

help the Court, the opposing party must support every denial with a citation to record evidence supporting a genuine dispute of material fact.").  "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  N.D.N.Y. L.R. 56.1(b) (emphasis omitted).  Additionally,

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(a)(3).

Kepro filed its motion for summary judgment on November 2, 2022, and included a Statement of Material Facts.  See Dkt. No. 108-3.  The Court notified plaintiff of his response deadline and of the consequences for failing to respond to the motion which warned plaintiff that if he "did not submit a proper response to the defendants' statement of material facts, the Court may deem [him] to have admitted the defendants' factual statements."  Dkt. No. 109 at 2.  The Court also informed plaintiff that "[f]ailure to respond to th[e] motion may result in [his] case being dismissed."  Id. at 1.  Kepro certified that it sent plaintiff a notice of the consequences for failing to respond to its motion.  See Dkt. No. 108-13 at 1.  Plaintiff filed a notice of change of address on March 1, 2023.  See Dkt. No. 110.  To date, plaintiff has not responded to Kepro's motion.

Plaintiff's failure to respond in accordance with Local Rule 56.1(b) permits the Court to deem admitted Kepro's properly supported facts that plaintiff does not specifically controvert.  See N.D.N.Y. L.R. 56.1(b); see also T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009) (emphasis added) ("A nonmoving party's

failure to respond to a Rule 56.1 statement *permits* the court to conclude that the facts

asserted in the statement are uncontested and admissible."). The Court "may in its

discretion opt to 'conduct an assiduous review of the record' even where one of the

parties has failed to file such a statement." Holtz v. Rockefeller & Co., 258 F.3d 62, 73

(2d Cir. 2001) (citation omitted). Here, plaintiff did not comply with the Local Rule 56.1,

nor did he submit any type of response. The undersigned will deem admitted any

properly supported facts in Kepro's Statement of Material Facts that are not specifically

controverted by the record. See Dkt. No. 108-3; see also N.D.N.Y. L.R. 56.1(b).

Because of plaintiff's pro se status, the undersigned exercises its discretion to review

the record for any disputes of material fact. See Advisory Committee Notes to 2010

Amendment to FED. R. CIV. P. 56 (noting that when a party "fails to properly address

another party's assertion of fact as required by Rule 56(c)," "the court may choose not

to consider the fact as undisputed, particularly if the court knows of record materials that

show grounds for genuine dispute," and "the court may seek to reassure itself by some

examination of the record before granting summary judgment against a pro se litigant");

see, e.g., Ford v. Deacon, No. 9:16-CV-01001 (MAD/TWD), 2018 WL 5729352, at *9

(N.D.N.Y. Aug. 27, 2018) ("[I]n deference to [the p]laintiff's *pro se* status, the Court, in

the exercise of its discretion, has opted to conduct an assiduous review of the entire

summary judgment record despite [the p]laintiff's failure to comply with the local rule."),

report and recommendation adopted, 2018 WL 4501208 (N.D.N.Y. Sept. 20, 2018),

aff'd, 793 F. App'x 13 (2d Cir. 2019) (summary order).

## II.  Factual Background

### A.  Undisputed Facts

Plaintiff suffers from gynecomastia, "a condition that causes male breast enlargement."  Am. Compl. at 3; Dkt No. 108-1 at 5, ¶ 19; Dkt. No. 108-4 at 8.  While incarcerated, plaintiff sought medical attention for this condition.  See Am. Compl. at 5-7; Dkt. No. 108-2 at 3, ¶ 6.

Kepro "is a utilization management provider."  Dkt. No. 108-2 at 1, ¶ 1; Dkt. No. 108-3 at 1, ¶ 1.  Kepro had a contract with DOCCS in 2013 under which Kepro would review incarcerated individuals' requests for medical services to determine whether the medical care was covered by DOCCS' health care plan.  See Dkt. No. 108-3 at 1, ¶ 2; Dkt. No. 108-2 at 2, ¶¶ 2-4.  "[I]t was DOCCS' health plan guidelines that dictated whether an inmate's request for medical services was covered under their plan."  Dkt. No. 108-2 at 2, ¶ 4.  If a medical service was not covered by DOCCS' health care plan, Kepro would determine whether the medical service was "medically necessary."  Id. at 2,  3; see also Dkt. No. 108-3 at 2, ¶ 3.  To determine medical necessity, Kepro relied on MCG[3] Care Guidelines.  See Dkt. No. 108-3 at 2, ¶ 4.  "MCG is a company that generates" "nationally recognized, evidence-based criteria and care guidelines."  Dkt. No. 108-2 at 2, ¶ 3.  "DOCCS asked Kepro to utilize the MCG Care Guidelines to assess medical necessity."  Id. at 2, ¶ 4.  "Kepro has no affiliation with MCG and is not involved in the creation of any of their care guidelines and/or clinical criteria."  Id. at 2, ¶ 3.  Plaintiff acknowledged during his deposition that the MCG guidelines are "a specific guideline that they go off of, basically to give like a cadence to each jail, or give each jail

---

[3] Defendant does not define "MCG."  Dkt. No. 108-1 at 2, ¶ 6; Dkt. No. 108-2 at 2, ¶ 3; Dkt. No. 108-4 at 8.

some type of uniformity into how to treat inmates, so you won't have one person just giving everybody  medical boots, or this jail just gives it."  Dkt. No. 108-10 at 56, lines 15-20.

"In situations where the criteria for medical necessity was not met, a Kepro Medical Director would recommend approval or denial of the medical services." Dkt. No. 108-2 at 2, ¶ 4.  "In situations where the medical services were recommended for denial, the Kepro Medical Director would route the request to a New York State DOCCS Regional Medical Director [("RMD")] for review and final decision."  Id.; see also Dkt. No. 108-3 at 2, ¶ 5.  If Kepro recommended denial, DOCCS' RMD "had the final decision-making authority to either approve or deny the requested care."  Dkt. No. 108-3 at 2, ¶ 6; Dkt. No. 108-2 at 2-3, ¶ 4-5.  "It was the clinical criteria, scope of review, and standards set forth by DOCCS which determined Kepro's recommendation."  Dkt. No. 108-2 at 6, ¶ 17.

According to Kepro's records, plaintiff was referred for surgery in January 2012. See Dkt. No. 108-12 at 4; see also Am. Compl. at 5.  Plaintiff's endocrinologist recommended that plaintiff see a surgeon.  See Dkt. No. 108-12 at 1.  At that time, plaintiff's condition was being treated with oral pain medication to balance his abnormal hormonal levels, but his breasts were "enlarged and very tender[,] causing him a lot of discomfort."  Id. at 4.  The surgical request was "denied" and "require[d] RMD review." Id. at 2.  "RMD" "agree[d] w/ APS denial but would suggest MRI or CT scan of the brain at this time in view of low testosterone, tender breasts, and inc[reased] prolactin levels and hypogonadism.  Suggest this before GSG BG."  Id. at 1.  Plaintiff's surgical requests were again referred to Kepro for review in September, November, and

6

December 2013. See Dkt. No. 108-2 at 3, ¶ 6; Dkt. No. 108-11 at 1-9. In September 2013, Kepro received a request of "routine" urgency to general surgery for "GSG eval of gynecomastia." Dkt. No. 108-11 at 3. Kepro was "unable to approve per any MCG." Id. Kepro "defer[red] surgical referral for RMD review as per APS MD." Id. at 2. "TEW" then commented, "need to explain painful circumstances." Id. at 1. In November 2013, Kepro received another request of "routine" urgency to general Surgery for "GSG eval of B/L gynecomastia." Id. at 6. The reason for the consultation was that plaintiff had "severe bilateral gynecoma[s]tia" which "require[d] surgical removal, not cosmetic, (this is significant deformity) there is no medical therapy for this degree of gynecomastia." Id. at 4. Kepro was "unable to approve per MCG guidelines." Id. at 6. The decision was "defer[red] for RMD review as per APS MD." Id. at 4-5; see also Am. Compl. at 6. The decision "require[d] RMD review." Id. at 4. "TEW" wrote, "What limitations/difficulties is this causing?" Id.

Plaintiff was again referred for medical services on December 5, 2013, with a request designated "soon" for general surgery. Dkt. No. 108-11 at 7. The reason for the consultation was because plaintiff had "longstanding hx breast pain and tenderness worse. . . . They strongly believe that surgery is his only option. He is longstanding and getting much worse." Id. Kepro was "unable to approve per GRG: SG-GS." Id. at 9. "SG-GS" was the "MCG guideline regarding general surgery procedures." Dkt. No. 108-2 at 5, ¶ 12. Kepro concluded that there was "no clear need for GSG as 'soon'. Defer as per APS MD." Dkt. No. 108-11 at 8. Kepro "denied" the decision at 6:54am on December 6, 2013, because "lack of medical necessit[.] Id.; see also Am. Compl. at 7.

Then, at 8:36am, "TEW: agree[d] with APS."  Dkt. No. 108-11 at 7; see also Am. Compl. at 7.

Plaintiff testified during his deposition that "[i]nmate with gynecomastia goes under review for R.M.D., as per A.P.S. M.D.  A.P.S. is the healthcare proxy that Timothy E. Whalen approved, right.  So basically he was in a position to deny or approve my surgery."  Dkt. No. 108-10 at 55.[4]  Plaintiff stated that on November 26, 2013, his "surgery was denied as per A.P.S. and Timothy E. Whalen, on error to provide per M.C.G. guidelines."  Id. at 56.  He also affirmed that when the medical records state that he "underwent a review an R.M.D." it was a reference to "something that [Dr. Timothy E. Whalen] approved."  Id. at 71-72.

In May 2015, plaintiff was referred to general surgery for "bilateral gynecomastia" because "there is no medical treatment for [his] degree o[f] gynecomastia.  Request GSG eval for bilateral mastectomies – not cosmetic."  Dkt. No. 108-12 at 5.  The request was "denied[,]" the "reason" was "requires RMD review" and the "decision comments" noted, "previously denied."  Id. at 6.  Additional comments were added, which stated, "Denied.  Has been denied multiple times.  Can send photos & clinical summary to CMO.  SCM."  Id. at 5.  These additional comments still included a "reason" of "requires RMD review."  Id.  Plaintiff was evaluated in 2017 by Maria E. Desimone, M.D., of Upstate University Health System.  See id. at 8-11.  She concluded that plaintiff's gynecomastia had not improved and plaintiff "should surgery for removal of

---

[4] Kepro attaches plaintiff's deposition to its summary judgment motion.  See generally Dkt. No. 108-10.  In doing so, it used the PDF document that was previously submitted by the individual defendants in support of their September 2021 motion for summary judgment.  See id.; see also Dkt. No. 97-3.  The CM/ECF headers from Dkt. No. 97-3 overlap with Dkt. No. 108-10, and the undersigned cannot discern the page numbers in the headers.  See generally Dkt. No. 108-10.  Thus, when citing to plaintiff's deposition, the undersigned will cite to the pagination in the top right corner of each deposition page.

breast tissue." Id. at 11.  Plaintiff had a breast reduction at "Albany Med." in 2019.  Dkt. No. 108-10 at 16.

### B.  Plaintiff's Disputed Allegations

The following allegations are derived from plaintiff's Amended Complaint.  See generally Am. Compl.  The Amended Complaint states, "I declare under penalty of perjury that the forgoing it ture [sic] and correct[,]" but it is not signed or dated.  Id. at 13; see also Rd. Dawgs Motorcycle Club of the U.S., Inc. v. Cuse Rd. Dawgs, Inc., 679 F. Supp. 2d 259, 268 (N.D.N.Y. 2009) ("In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the non-movant should be treated as an affidavit."); see also Tafari v. Brown, No. 9:10-CV-1065 (GTS/DRH), 2012 WL 1098447, at *6, n.8 (N.D.N.Y. March 30, 2012) (explaining that a complaint that is not signed or verified "does not have the force and effect of an affidavit").[5]  Plaintiff's affidavit of service, which is one page after his unsigned perjury declaration, is signed and notarized.  See Am. Compl. at 14.  Kepro does "not dispute the accuracy of the pleading and rely upon the facts set forth in the amended complaint in support of the motion.  Therefore, the undersigned will accept the pleading as an affidavit to the extent that the statements are based on Williams' personal knowledge." Williams v. Koenigsmann, No. 9:21-CV-0302 (TJM/CFH), 2022 WL 7288515, at *1 (N.D.N.Y. May 6, 2022) (citations omitted), report and recommendation adopted, 2022 WL 4363994 (N.D.N.Y. Sept. 21, 2022).[6]

---

[5] Unpublished cases cited in this Report-Recommendation and Order have been provided to plaintiff, unless otherwise noted.

[6] Copies of the Report-Recommendation and Order and Decision and Order from the individual defendant' motion for summary judgment were previously provided to plaintiff and the undersigned will not provide them, again.  See Dkt. Nos. 100, 102.

Plaintiff alleges that Kepro "has de[nie]d several referrals for surgery. The last being on the date of may 21-2014 even after facility health services Directors and medical providers employed by the [DOCCS] repeatedly request mastectomy to stop plaintiff[']s suffering from this serious injury." Am. Compl. at 7. He contends that "APS was fully aware of plaintiff[']s medical condition, but reclassified surgery as being cosmetic in order to meet 'MCG Guide lines'." Id. at 7-8. He also avers that "[t]he referral for the surgery the grievant is seeking has again been submitted and has been denied by CORC on the date of 5/21/14 because of APS denial of Facility Health Services Directors referral for Mastectomy." Id. at 12. Plaintiff testified that "A.P.S." denied his requests "because it's cosmetic, we're not going to give you a treatment, right[.]" Dkt. No. 108-10 at 36. Then, after acknowledging the purpose of the MCG Guidelines, plaintiff testified, "but now in my instance, because it's gynecomastia, without examining me, they just automatically threw my situation in the cosmetic pile, and didn't take into the fact that it was causing me pain." Id. at 56.

### III. Legal Standards

#### A. Summary Judgment Standards

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citation omitted); see FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party has the

burden of showing the absence of a genuine dispute of material fact by citing to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).  A fact is material if it "might affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

If the moving party meets this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 248 (citation omitted); see Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  Still, the nonmoving party cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)); see also Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted) ("[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.").

Where, as here, a party seeks judgment against a <u>pro se</u> litigant, the Court must afford the non-movant special solicitude. <u>See</u> <u>Treistman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit explained,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," that a *pro se* litigant's submissions must be construed "liberally," and that such submissions must be read to raise the strongest arguments that they "suggest[.]" At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, or arguments that the submissions themselves do not "suggest," that we should not "excuse frivolous or vexatious filings by *pro se* litigants," and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law[]" . . . .

<u>Id.</u> (citations and footnote omitted); <u>see also</u> <u>Sealed Plaintiff v. Sealed Defendant</u>, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a court is obligated to construe his pleadings liberally.") (citations and internal quotation marks omitted).

## B. **Monell** Liability

Kepro argues that it cannot be held liable under § 1983 because it was not acting under the color of state law, plaintiff did not sue an agent of Kepro, and it did not promulgate an unconstitutional policy or custom. <u>See</u> Dkt. No. 108-4 at 6-10.

"It is well-settled that a plaintiff alleging a violation of her constitutional rights under [§] 1983 must show state action." <u>A.S. v. City Sch. Dist. of Albany</u>, 585 F. Supp. 3d 246, 284 (N.D.N.Y. 2022) (citing <u>Fabrikant v. French</u>, 691 F.3d 193, 206 (2d Cir. 2012)).

> While private parties generally are not state actors, their conduct can be attributed to the state for [§] 1983 purposes if "(1) the State compelled the conduct [the "compulsion test"], (2) there is a sufficiently close nexus

12

> between the State and the private conduct [the "joint action test' or 'close nexus test"], or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the state [the "public function test"]."

Id. (citation omitted); see also Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255, 257 (2d Cir. 2008) (per curiam). "The 'fundamental question' for each test is whether the private party's conduct is 'fairly attributable' to the state such that it bears responsibility." Id. (citation omitted). "Conclusory allegations that a private person acted in concert with a state actor are insufficient to maintain a conspiracy claim under § 1983." Parent v. New York, 786 F. Supp. 2d 516, 539 (N.D.N.Y. 2011) (citation omitted).

"To make out a claim for state action under the 'compulsion' test, a plaintiff must show that the state actor 'exercised coercive power or . . . provide[d] such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" Momot v. Dziarcak, 208 F. Supp. 3d 450, 456 (N.D.N.Y. 2016) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)). "To prevail under the 'joint action' test, [the p]laintiff must show that '[t]he State has so far insinuated itself into a position of interdependence with [the private defendants] . . . that it must be recognized as a joint participant in the challenged activity.'" Id. (quoting Burton v. Wilmington Parking Authority, 365 U.S. 715, 725 (1961)). "Finally, to prevail under the 'public function' test, [the p]laintiff must show that [the private d]efendants' functions as providers of [] care are traditionally the *exclusive* prerogative of the State." Id. (quotation marks omitted) (quoting Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982)).

Additionally, "[i]t is well settled that a municipality cannot be held liable under § 1983 solely on a theory of *respondeat superior*." Marcano v. City of Schenectady, 38

F. Supp. 3d 238, 265 (N.D.N.Y. 2014) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692 (1977)).  "Because municipalities may not be held vicariously liable for the actions of their employees, a claim against a municipality must be premised on the theory that it maintained a policy, practice, or custom that caused the plaintiff's constitutional injury."  Id. (citation omitted).  "[T]he elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right."  Friend v. Gasparino, 61 F.4th 77, 93 (2d Cir. 2023) (quoting Agosto v. N.Y.C. Dep't of Educ., 982 F.3d 86, 95 (2d Cir. 2020)).  "In other words, municipalities may not be held liable 'unless action pursuant to *official municipal policy* of some nature caused a constitutional tort.'"  Id. (quoting Monell, 436 U.S. at 691).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  Id. (quoting Connick v. Thompson, 563 U.S. 51, 61 (2011)).

## IV.  Analysis

### A.  Whether Kepro is a State Actor

Kepro is a private company that was hired by DOCCS to review incarcerated individuals' medical requests.  See Dkt. No. 108-2 at 1, ¶ 1; 2, ¶ 4.  "Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses."  Rojas v. Alexander's Dept. Store, Inc., 924 F.2d 406, 409 (2d Cir. 1990).  "It is [] clear that hospitals and physicians that provide care outside of the prison facility may be held

to be state actors when they work pursuant to contract." Sykes v. McPhillips, 412 F. Supp. 2d 197, 202 (N.D.N.Y. 2006); see also West v. Atkins, 487 U.S. 42, 54 ("Respondent, as a physician employed by North Carolina to provide medical services to state prison inmates, acted under color of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury. Such conduct is fairly attributable to the State."); Illescas v. Annucci, No. 21-CV-8473 (NSR), 2022 WL 17539696, at *3 (S.D.N.Y. Dec. 7, 2022) (collecting cases) ("[C]ourts have treated non-public medical providers to be state actors when they provide inmates with medical treatment outside of a prison pursuant to a contract."); Burgess v. Cnty. of Rensselaer, No. 1:03-CV-00652 (NPM/RFT), 2006 WL 3729750, at *4 (N.D.N.Y. Dec. 18, 2006) (citations omitted) ("[G]iven its contractual relationship with the County to provide nursing services to County jail inmates, as the nurse defendants acknowledge in their reply memorandum, 'Adept [Health Care Services, Inc.] may very well be a state actor for the purpose of § 1983[.]'"); Wright v. Genovese, 694 F. Supp. 2d 137, 152 (N.D.N.Y. 2010) (citations omitted) ("While Dr. Miller and his practice group were not a party to the [Albany Medical Center] contract with DOCS, they had an ongoing relationship with [Albany Medical Center] and 'often' provided consultation and surgery services to state inmates. . . . The existence of a formal or informal contractual arrangement between a hospital and prison authorities makes it more appropriate to classify the staff of the hospital involved with treating inmates as state actors."); aff'd, 415 F. App'x 313 (2d Cir. 2011) (summary order).

Applying the logic of the cases concerning hospitals and medical practitioners, courts have determined that other private companies can be state actors if they were

acting pursuant to a contract with a state prison.  See, e.g., Mercer v. APS Healthcare, Inc., No. 9:13-CV-0840 (DNH/RFT), 2015 WL 5692563, at *7 (N.D.N.Y. Sept. 28, 2015) (finding "that APS [Healthcare, Inc.] collaborated with DOCCS to determine appropriate care for inmates and did so with state authority[]" for purposes of the summary judgment motion), aff'd, 669 F. App'x 9 (2d Cir. 2016) (summary order); Phillips v. Wright, No. 9:09-CV-1328 (GTS/RFT), 2010 WL 5565669, at *8 n.6 (N.D.N.Y. Aug. 11, 2010 (concluding at the motion to dismiss stage that "[b]ecause [the p]laintiff alleges that APS Healthcare is under contract with DOCS, he has made a facially valid allegation that such entity acted under color of state law."), report and recommendation adopted, 2011 WL 94173 (N.D.N.Y. Jan. 11, 2011); Probst v. Cent. Ohio Youth Ctr., 511 F. Supp. 2d 862, 869-71 (S.D. Ohio 2007) (concluding that Consolidated Care, Inc., a non-profit corporation that performs suicide evaluations for Central Ohio Youth Center, was a state actor); Poole v. Armor Corr. Health Servs., No. 15-CV-2927 (JFB/AKT), 2016 WL 1089350, at *3, n.2 (E.D.N.Y. Mar. 21, 2016) (citations omitted) ("Armor is a private entity contracted to provide medical services to inmates at the [Nassau County Correctional Center].  Because Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, Armor was 'acting under the color of state law' for purposes of Section 1983."); Bedard v. Centurion of Vermont, LLC, No. 5:20-CV-161 (GWC/KJD), 2021 WL 4699245, at *3 (D. Vt. Aug. 27, 2021) ("Centurion is arguably more than a mere private corporation, as it provides medical care to prisoners on behalf of the State of Vermont."), report and recommendation adopted, 2021 WL 4666331 (D. Vt. Oct. 7, 2021).

In concluding that private health care actors were state actors for the purposes of a §1983 action, courts have determined that the relationship between the private entity and the state met the "public function" test.  See, e.g., Burgess, 2006 WL 3729750, at *4; West, 487 U.S. at 54; Poole, 2016 WL 1089350, at *3, n.2; Probst, 511 F. Supp. 2d at 869-71.  "As the Supreme Court has instructed, the relevant question is not simply whether a private group is serving a 'public function' . . . .  [T]he question is whether the function performed has been traditionally the exclusive prerogative of the State." Hollman v. Cnty. of Suffolk, No. 06-CV-3589 (JFB/ARL), 2011 WL 280927, at *5 (E.D.N.Y. Jan. 27, 2011) (quotation marks omitted) (quoting Rendell-Baker, 457 U.S. at 842).  In the context of a private physician seeking admitting privileges at a private hospital that received federal funding and was regulated by a state's Department of Health, "[t]he Second Circuit has held that general hospital functions are generally not 'traditionally associated with sovereignty' under the public function test."  Id. (quoting Schlein v. Milford Hosp., Inc., 561 F.2d 427, 429 (2d Cir. 1977) (per curiam)).  However, "'[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.'  In light of this, . . . the State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated."  West, 487 U.S. at 54 (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)).  The Second Circuit has more recently noted that "[u]nder the public function test . . . courts have found state action when private parties perform such sovereign functions as medical care for prison inmates[.]"  Grogan v. Blooming Grove Volunteer Ambulance Corps, 768 F.3d 259, 264-65 (2d Cir. 2014) (citations omitted); see also Sherlock v. Montefiore Medical Center, 84 F.3d 522, 527

(2d Cir. 1996) (citation omitted) ("The fact that a municipality is responsible for providing medical attention to persons held in its custody may make an independent contractor rendering such services a state actor within the meaning of § 1983 with respect to the services so provided[.]").

Circumstances under which a private physician or hospital has been held not to be a state actor are such that the private entity interacted with the plaintiff in an emergent or isolated situation, and not according to a contract with a government entity. See Ilescas, 2022 WL 17539696, at *3 (collecting cases) ("[C]ourts have held that the provision of medical care by a private hospital to an individual in police custody on the same terms as the hospital would provide to the public at large does not satisfy the state action test, i.e., when a private doctor is alleged to provide services for an inmate outside of a correctional facility but there is no allegation that the medical services were provided pursuant to a contract or state compulsion."); Kavazanjian v. Rice, No. 03–CV1923 (FB), 2008 WL 5340988, at *12 (E.D.N.Y. Dec. 22, 2008) ("Providing isolated emergency treatment to a prisoner on equal terms with the general public . . . does not constitute state action."); Hollman, 2011 WL 280927, at *5 ("[C]ourts have held that the provision of medical care by a private hospital to an individual in police custody on the same terms as the hospital would provide to the public at large does not satisfy the state action test[.]"); Morse v. City of N.Y., No. 00-CV-2528, 2001 WL 968996, at *8 (S.D.N.Y. Aug. 24, 2001) ("The fact that [the plaintiff] was brought to the hospital from police custody and was released from the hospital into police custody is insufficient to transform this private hospital and its staff into state actors for section 1983 purposes.").

Here, Kepro reviewed plaintiff's medical service requests pursuant to a contract with DOCCS.  See Dkt. No. 108-2 at 2, ¶ 4.  Kepro's conduct was not related to only emergency situations, nor was its review, isolated.  See id. at 3-5, ¶¶ 7-13.  Because Kepro acted according to a contract with DOCCS to perform functions traditionally performed by the prison, and such a relationship has been repeatedly held to turn the private entity into a state actor for purposes of § 1983.  See, e.g., Mercer, 2015 WL 5692563, at *6-7; Phillips, 2010 WL 5565669, at *8, n.6; Probst, 511 F. Supp. 2d at 869-71; West, 487 U.S. at 55-57; Wright, 694 F. Supp. 2d at 151-52; Burgess, 2006 WL 3729750, at *4; Bedard, 2021 WL 4699245, at *3; Poole, 2016 WL 1089350, at *3, n.2.  Thus, Kepro's conduct constitutes state action under the public function test.

Kepro argues it "had so little actual responsibility for plaintiff's medical care that it [] cannot be said as a matter of law that [it] was a state actor."  Dkt. No. 108-4 at 9.  Kepro notes that it only reviewed plaintiff's requests, did not perform any treatment, and did not create the health care plan or guidelines it was required to follow.  See id.  This Court has been "unpersuaded" by Kepro's exact argument.  Mercer, 2015 WL 5692563, at *6, n.12.  In Mercer, the Court explained,

> [a]lthough the APS Defendants contend that they merely provided preliminary determinations and DOCCS was the final reviewer of any denial, the Court finds that this indeed was a health service despite DOCCS's ability to override such denials.  It is a matter of common sense that "prison and jails are inherently coercive institutions that for security reasons must exercise nearly total control over their residents' lives and the activities within their confines[.]" *Sykes*[, 412 F. Supp. 2d at 201 (N.D.N.Y.2006) (quoting *West*, 487 U.S. at 55-56)].  Thus, it is unsurprising to the Court that DOCCS reserves the right to approve a referral despite a previous denial issued by APS. As a result, the Court is unpersuaded by the APS Defendants' semantic argument that they only provided "preliminary" denials rather th[a]n outright denials.

Id.  Similarly, in <u>Probst</u>, Consolidated Care, Inc., or "CCI", "argue[d] that, even if th[e c]ourt holds that providing mental healthcare to inmates is a public function, because 'providing suicide assessments on an as-needed basis is clearly not the same and is dissimilar to providing full-time mental-health services,' CCI did not act under color of state law." 511 F. Supp. 2d at 870.  The court explained

> that mental healthcare in prisons is a public function. By extension, each sub-division of mental healthcare is also a public function.  If this Court were to adopt CCI's argument, the government could outsource each aspect of its prison healthcare system to a different private entity, and each entity could claim that it is not a state actor because it performs only a limited function within the overall prison medical system. The Supreme Court in *West* already held that a private entity may not escape liability as a state actor merely because of the limited amount of time in which it performs a state function.

Id. (citing <u>West</u>, 487 U.S. at 56 ("It is the physician's function while working for the State, not the amount of time he spends in performance of those duties or the fact that he may be employed by others to perform similar duties, that determines whether he is acting under color of state law.")).

Here, Kepro was not the only entity reviewing plaintiff's medical services' requests, it did not create the guidelines it was required to follow, and it did not treat plaintiff.  <u>See</u> Dkt. No. 108-2 at 2-3, ¶¶ 3, 5, 7; 5, ¶ 15.  Kepro performed the initial review, recommended a grant or denial of care based on MCG guidelines, and the DOCCS' RMD, Dr. Timothy E. Whalen, made the final decision of whether to grant or deny the request.  <u>See</u> Dkt. No. 108-2 at 3-4, ¶¶ 4-5; 6-7, ¶¶ 18-19; Dkt. No. 108-11 at 1-9.  Although Kepro did not make the final decision as to whether to grant or deny plaintiff's medical requests, it performed its review pursuant to a contract with DOCCS, a government entity, to handle a portion of medical services.  Performing medical

services for incarcerated individuals is traditionally the function of the state.  Kepro's

participation in only part the process does not detract from its participation in a public

function—providing medical services to incarcerated individuals.  See Mercer, 2015 WL

5692563, at *6; Probst, 511 F. Supp. 2d at 870.  As Kepro collaborated with DOCCS to

review incarcerated individual's medical requests, pursuant to a contract, it was acting

with state authority.

### B.  Whether Kepro Can be Held Liable Under Monell

To warrant summary judgment, there must be no genuine dispute of material fact

as to whether Kepro was acting pursuant to a municipal policy or custom that caused

plaintiff to be subjected to the deprivation of a constitutional right.  See generally Friend,

61 F.4th at 93; see also FED. R. CIV. P. 56(a).

Kepro relied exclusively on DOCCS' health care plans and the MCG Care

Guidelines to determine the eligibility and medical necessity of plaintiff's requests.  See

Dkt. No. 108-2 at 2, ¶¶ 2-4; 4-5, ¶¶ 9, 11, 13.  Plaintiff does not allege that the plan or

guidelines are unconstitutional.  See generally Am. Compl.  Even if he did, there is

nothing in the record to indicate that Kepro had final policy making authority with either

the health care plan or MCG Guidelines.  See Edrei v. City of New York, 254 F. Supp.

3d 565, 579-80 (S.D.N.Y. 2017) (citation omitted) ("It is ultimately the plaintiff's burden

to establish, as a matter of law, "that [an] official had final policymaking authority in the

particular area involved[.]"), aff'd sub nom. Edrei v. Maguire, 892 F.3d 525 (2d Cir.

2018).  Kepro "did not utilize any of its own policies or customs when processing"

plaintiff's medical requests.  Dkt. No. 108-2 at 4-5, ¶¶ 9, 11, 13.  DOCCS chose the

guidelines and plan that Kepro utilized.  See id. at 2-3, ¶¶ 4, 6-7.  Plaintiff has not

presented any admissible evidence demonstrating that Kepro had final policy-making authority or utilized its own policies.

To be sure, Kepro's records state that is "denied" plaintiff's requests, but these denials were based on MCG Care Guidelines and DOCCS' health care plan, not a Kepro policy. Dkt. No. 108-11 at 1-2, 4-5, 7-8. Plaintiff does not dispute this fact with any admissible evidence. Because plaintiff has not sued an agent of Kepro who preliminarily denied the medical services requests and he does not present evidence that Kepro acted according to an unconstitutional policy and custom, plaintiff's allegations in his complaint are insufficient to withstand summary judgment. See Swinton v. Livingston Cnty., No. 21-1434, 2023 WL 2317838, at *1 (2d Cir. Mar. 2, 2023) (summary order) (citation omitted) ("[A] plaintiff must identify either an 'express rule or regulation,' a practice that 'was so persistent or widespread as to [carry] the force of law,' or misconduct of 'subordinate employees' that 'was so manifest as to imply the constructive acquiescence of senior policy-making officials.'").

Plaintiff alleges that Kepro "reclassified" plaintiff's surgery as "cosmetic in order to meet 'MCG Guide lines'." Am. Compl. at 7-8. He also alleges that Kepro denied a surgery request in May 2014. See id. at 7, 12. These allegations are entirely unsupported by anything in the record. See Mitchell v. Annucci, No. 9:17-CV-0892 (TJM/DJS), 2020 WL 7029136, at *6 (N.D.N.Y. Sept. 3, 2020) (citation and quotation marks omitted) (second alteration in original) ("[The p]laintiff has simply made the conclusory statement that such a policy exists in his [amended] complaint which is insufficient to withstand summary judgment."), report and recommendation adopted, 2020 WL 6375468 (N.D.N.Y. Oct. 30, 2020); Jackson v. Cnty. of Nassau, No. 07-CV-

245 (JFB/AKT), 2010 WL 335581, at *12 (E.D.N.Y. Jan. 22, 2010) (collecting cases)

("[C]onclusory allegations as to the existence of a policy or custom are insufficient to

withstand summary judgment."); Carter v. Cnty. of Suffolk, No. 12-CV-1191 (JFB/ARL),

2013 WL 6224283, at *4 (E.D.N.Y. Dec. 2, 2013) ("Because there is absolutely no

evidence of an unconstitutional policy, practice, or custom by the County, the Court

concludes that the County is entitled to summary judgment on [the] plaintiffs' [§] 1983

claim."); Brown v. Goord, No. 9:04-CV-0785, 2007 WL 607396, at *9 (N.D.N.Y. Feb. 20,

2007) (granting summary judgment because "[t]here is no evidence that [the d]efendant

[] enforced or allowed to continue a policy or custom that sanctioned any constitutional

violation (assuming there was such a violation). . . .  [The p]laintiff] does not even bother

to specify the 'policy and custom' to which he is conclusorily referring.").

   This case is similar to Bedard, in which the court concluded that Centurion, a

private company that contracted with Vermont's Department of Corrections, was

"arguably more than a mere private corporation, as it provides medical care to prisoners

on behalf of the State of Vermont."  2021 WL 4699245, at *3.  The court noted,

however, that the plaintiff failed to allege "that any other type of Centurion policy,

custom, or usage caused his injuries.  For example, [the plaintiff] d[id] not identify

actions taken by any individuals with policymaking authority that caused the deprivation

of his rights."  Id. at *4.  "Nor ha[d] [the plaintiff] alleged 'a practice so consistent and

widespread' that it amounted to a custom or usage of which Centurion should have

been aware."  Id.  Thus, the court dismissed the claims against Centurion.  See id.;

compare Johnson v. State of Vermont, No. 22-CV-00029, 2023 WL 3548801, at *22 (D.

Vt. May 18, 2023) ("[The p]laintiff does not identify Centurion's policy or custom at issue

or explain how it proximately caused [the decedent's] suffering or death.  Although she

claims acts and omissions by various Centurion employees, she does not plausibly

allege those individuals were carrying out Centurion's directives.  She also does not

identify the training or supervision that would alleviate [the decedent's] harm.  [The

p]laintiff therefore does not allege a plausible § 1983 Monell claim against Centurion."),

with Gleeson v. Cnty. of Nassau, No. 15-CV-6487 (AMD/RL), 2019 WL 4754326, at *15

(E.D.N.Y. Sept. 30, 2019) (citations omitted) (concluding that private companies that

had contracted with state prisons were state actors for purposes of § 1983, and denying

summary judgment because "[t]he Comptroller report, AAG affirmation, and [New York

State Commission of Correction] reports about the treatment of [three] inmates . . .

detail [the companies'] 'egregious lapses in medical care' and its 'pattern' of inadequate

care.").

      Here, plaintiff failed to produce any admissible evidence demonstrating that the

policies Kepro was required to follow were unconstitutional, that it had any policy-

making authority, or that any subordinate engaged in a longstanding custom of

providing inadequate care.  See generally Am. Compl.  As there is nothing in the record

sufficient to create a dispute of material fact, the undersigned recommends granting

Kepro's motion for summary judgment.

## V.  Conclusion

**WHEREFORE**, based on the foregoing, it is hereby:

24

**RECOMMENDED**, that Kepro's motion for summary judgment (Dkt. No. 108) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's claim against Kepro, as alleged in his amended complaint (Dkt. No. 51), be **DISMISSED WITH PREJUDICE**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.[7]

Dated:  August 8, 2023
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[7] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections.  See FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  See id. § 6(a)(1)(C).